MARGARET HENRY

*v.*

IMPERIAL COUNCIL OF ORDER OF UNITED FRIENDS.

1. The widow and beneficiary of a member of a beneficial order, on the payment to her of $500, released the order from the payment of her claim of $3,000 upon the false representation of the officers of such order that deceased was not in good standing at the time of his death and that she had no claim whatever against it.—*Held,* that on proof of such a state of facts, a court of equity will set the release aside.

2. The fact that the widow had the benefit of the advice of competent counsel does not deprive her of relief, if the counsel was also misinformed by such officers.

On bill, answer, replication and proofs in open court.

*Mr. William D. Daly* and *Mr. William M. Dougherty,* for the complainant.

*Mr. J. Frank Fort,* for the defendants.

Henry v. Order of United Friends.

GREEN, V. C.

The Order of United Friends is a beneficial society, having a parent organization called the "imperial council," with jurisdiction over grand councils in ten states, including New York and New Jersey, which grand councils have power to establish subordinate councils in their respective states.

The imperial council is incorporated under the laws of the State of New York, under an act entitled "An act for the incorporation of societies and clubs for certain lawful purposes," passed May 12th, 1875, and also "An act concerning charitable, benevolent and beneficial associations and societies as a corporation," passed May 12th, 1881.

Among the objects of the association, as appears by its certificate, is one to promote benevolence and charity, by establishing a relief fund from which a member of the association, who has complied with all the laws, rules and regulations, or a person or persons by such member lawfully designated, or the legal heir or heirs of such member, may receive a benefit, in a sum not exceeding $3,000, which shall be paid  *  *  *  upon satisfactory evidence of the death of a member, and when all the conditions regulating such payment shall have been complied with.

Provision is made by the laws of the order for the payment, *  *  *  to a designated beneficiary, or the heirs of a member, of the amount of insurance guaranteed to members of his class, on the death of any such member.  The amount of the benefits and insurance to be paid is provided for by a relief fund which is under the exclusive control and management of the imperial council and its officers.  The order and the different councils are governed by the provisions of the articles of incorporation, the constitution and general laws promulgated by the imperial council.

The relief fund is created and maintained by assessments made upon each member of the order.  Calls for these assessments are made by the imperial recorder and forwarded to the subordinate councils ; and it is the duty of the financier of the subordinate council to receive all moneys for the relief fund, and

keep an account of the same in separate books provided for that purpose.   The law provides that every person, on becoming a beneficiary member of the order, shall pay the amount prescribed in a table of assessments for the relief fund, and the same amount on each assessment called thereafter while he or she remains a member of the order.   The financier is required to keep the date when such payments are made, and credit the member with the same.   From this fund $1,000 is to be paid on the death of a member of the first class, $2,000 on that of a member of the second class, and $3,000 on that of a member of the third class.

The imperial recorder is required on the first day of each month, if there is less than $3,000 in the relief fund, to pay death and disability losses, to notify each subordinate council to forward to him the amount of one assessment within fifteen days, and when more than one assessment is necessary in one month, the other is to be dated the 15th and to be forwarded within thirty days.

He is also required, at the time of issuing such notice, to make such assessments as may be necessary to provide for the payment of all losses of the relief fund, which the imperial council may be liable to pay at either date, and forward to each recorder of subordinate councils a sufficient number of notices thereof, to notify each beneficiary member of his council.   Such subordinate council recorder is required, within eight days, to serve the notice upon each beneficiary member of his council, and each beneficiary member is required to pay the amount due on the notice, at the council-room of his council, at a regular meeting thereof, to the financier of his said council, or to the financier personally at a place designated, and

"any member who fails or neglects to pay such assessments within thirty days from the date of said notice, shall stand suspended from the order and forfeit all his rights, benefits and interests of, in and to the relief fund."

Mr. Shedd, the imperial recorder, says that the way assessments are called in, that having ascertained the amount of money in the relief fund, they estimate the probable number of deaths

in the ensuing month on the basis of the deaths which had occurred in the previous month, and regulate the number of assessments in accordance therewith.

The financier of a subordinate council was required to report to the recorder thereof, at the next meeting of his council, the names of such persons as have become suspended, with the date of such suspension, which the recorder is required to enter on the minutes of the council.

When a member was suspended for non-payment of an assessment, he could by the mere payment, within one month after his suspension, of all dues and assessments, reinstate himself, without ballot or medical examination. If, however, he failed to so reinstate himself, it was necessary for him to apply to the council for reinstatement, and, as a condition thereof, pay all dues and assessments past due as well as those which had been called after his suspension, and furnish the council with a physician's certificate as specified, and he could then be reinstated by a ballot taken, if a majority should be found in favor thereof.

Thomas Henry was a member of Erie Council, No. 47, of Jersey City. He, as a member of the third class, obtained relief certificate No. 1,998, dated March 4th, 1885, for $3,000, to be paid to his wife, Maggie Henry, on his death. By the relief fund table each assessment to be paid by him, as a member of his class, was $1.05.

He died February 19th, 1890, after a short illness.

On the day of his death, his widow, the complainant, was waited upon by some of the officers of the Erie council, who requested her to change the time of her husband's funeral from Saturday, as she had determined, to Sunday, in order that the council, "of which," they said, "he was an honored member," might more conveniently attend.

She did, in accordance with such request, alter her arrangements, and Thomas Henry was buried on Sunday. The members of Erie council attended the funeral in a body, the council paid for the advertisement and some other incidentals attending the funeral, which was conducted under the supervision of Mr. Davis and Mr. Sweeney, the officers of the council.

By a report made by the officers of Erie council to the imperial recorder, under date of February 24th, 1890, Mr. Henry was returned as in good standing, having been reinstated February 11th, 1890, on a suspension, and the return included the amount which Mrs. Henry had paid to the financier the day before Henry's death. The report of his reinstatement was afterwards erased and the paper returned by the imperial recorder to the Erie council, to deduct the amounts credited to Mr. Henry.

Trouble arose almost immediately after Mr. Henry's funeral, as to whether he was, at the time of his death, a member of Erie council in good standing or suspended for the non-payment of assessments.

After much controversy and negotiation, his widow finally settled with the defendant for $500, and she now seeks to set aside a release, which she then executed, of all claims against it by reason of the relief fund certificate, and to recover the balance of $2,500.

The defendant insists that Thomas Henry was, at the time of his death, suspended for the non-payment of assessments. The action of the officers and members of Erie council, with reference to his death and funeral services, eliminate every other ground for claiming he was not a member in good standing. It was admitted and proved that assessments had been regularly called, of which notice had been given to the decedent as follows : No. 114, payable December 25th, 1889 ; No. 115, December 31st, 1889 ; No. 116, January 15th, 1890 ; No. 117, January 30th, 1890 ; No. 118 and disability 1, February 15th, 1890. The case will eventually be found to turn on whether assessment No. 116, due January 15th, was paid that day or within thirty days thereafter.

Among Mr. Henry's papers there were found the relief fund certificate named and several receipts, including one written on a blank form of receipt, dated " Hall of Erie Council, No. 47, December 30th, 1889," as having received of T. Henry $5.20 for assessments Nos. 110, 111, 112, 113 and 114, and signed by " C. W. Davis, financier." Also, another receipt, similar in

form, signed by "C. W. Davis, financier," dated January 15th, 1890, for $1.05, for assessment No. 115.

Mrs. Henry testified that, on a meeting night in the middle of January, 1890, which is shown to have been January 15th, she paid $3 to the son of Davis, the financier, on account of two assessments, one then past due and one due that night. This amount of $3 Mr. Davis admits in his testimony he received from his son.

On February 18th Mrs. Henry paid to Davis, the financier, personally, $5.25, for which he gave her a receipt for $4.20. By the first receipt, above referred to, all assessments up to and including No. 114 were paid December 30th. This would leave, on January 15th, when Mrs. Henry paid the $3, No. 115, payable December 31st, due and unpaid, and No. 116, due January 15th, the amount due on the two being only $2.10.

No. 117 was payable on January 30th, No. 118 and disability 1 on February 15th. Not having paid them when they fell due, Henry became suspended on each, but could reinstate himself by the payment within thirty days. February 18th was within such thirty days, and on that day Mrs. Henry paid Mr. Davis, personally, $5.25, the amount of five assessments.

Besides the receipts named, there is another, dated January 15th, 1890, for $1.05, which amount Mr. Davis says Mr. Henry personally paid to him.

These receipts, if reliable, with Mrs. Henry's testimony, establish that her husband, at the time of his death, on February 19th, 1890, was not in arrears for assessments, and consequently that she was entitled to receive $3,000, the whole amount of the relief certificate issued to him; for if Mr. Henry, or his wife for him, paid the amount of the assessments to the financier of Erie council within the thirty days, in which he could, by payment of assessments due, reinstate himself, he was then a member in good standing, as the financier of the subordinate council is the agent of the imperial council, to receive the moneys due upon the assessments, and payment to him is all that is required. Any failure on his part to properly perform his duty and pay

over the money and report its receipt, cannot affect the beneficiary of the fund. *Schunck* v. *G. W. & W. Fond, 44 Wis. 369.*

Independent of the question of settlement and release, this testimony throws the burden of proof upon the defendant to show that these receipts are not correct. It seeks to meet this position by the returns made by Erie council to the imperial council and by the testimony of Mr. Davis, the financier. A book was produced and put in evidence, without objection, which consisted, originally, of a number of blanks bound up in pamphlet form, called "the relief fund statement." The blanks composing this book were furnished by the imperial recorder, for reports to be made by the different councils to him of payments made on account of the several assessments, with a return of membership, showing the increase and decrease by suspension, and reinstatements, deaths and admissions. The blanks, being two for each assessment, are bound up consecutively, and the officers of the subordinate council are required to fill out each blank under a particular date, showing the number of members of their council in each class, their ages, the class-rates, the total amounts received upon that particular assessment, with a report of payments made on back assessments, and to remit to the imperial treasurer the amount so collected, less five per cent. retained for the reserve fund of the subordinate council.

This report is required to be signed by the chief councilor and recorder of the subordinate council, and the statement of amount remitted by the treasurer thereof.

On the back, a report of the increase and decrease in membership of the council since the last preceding assessment, is required to be made. One of these reports, so made out and signed, is then torn out of the book and sent to the imperial recorder, with the money. The other is left in the book, making a record.

By this record, it appears that Thomas Henry was reinstated on assessment No. 109, by its payment, November 2d. He was never reported as suspended on assessments Nos. 110, 111 or 112, but he does appear to have been suspended December 10th, 1889, for non-payment of assessment No. 113. On the return

of payments on account of assessment No. 114, due December 25th, which return is dated December 28th, Thomas Henry is not returned as delinquent. On the return for assessment No. 115, originally dated January 8th, 1890, and altered to December 30th, Henry is reported as reinstated on No. 113 and suspended on No. 114. He is not reported as delinquent on No. 115, and was never so reported on that assessment.

By report dated January 14th, 1890, he is reported as reinstated January 15th, but it is not stated upon what suspension he is reinstated. There are pencil marks " 115 " and " 114 " upon this paper, on the heading of the report of increase of membership, but not in connection with the name of T. Henry. He is reported on this report as suspended on January 15th, on assessment No. 116. This report, which is in Mr. Davis' handwriting and is marked " Exhibit C 19," has been torn out of the book, but I do not recall whether it was so done during the trial or not.

The duplicate thereof, dated January 14th, sent to the imperial recorder, was also produced, and was marked " Exhibit C 22."

This report, while it is dated January 14th, purports to give the receipts on account of assessment No. 116, which was not due until the next day. It also reports a member as reinstated and others as suspended, as of January 15th, and among them Thomas Henry as suspended on No. 116. This reported suspension is the crucial point in the case, for, if No. 116 was paid in time, there is no ground for claiming Henry was not in good standing. In this connection it must be remembered that this report is dated January 14th, and that it was on the evening of January 15th, when No. 116 was due, that Mrs. Henry paid the $3 to Davis' son.

What probative force have these records as against the complainant?

They are not minutes of the proceedings of the council of which Henry was a member. They are only reports made by the chief councilor, the recorder and the treasurer, of course, from data furnished to them by the financier, to the imperial recorder of the receipts by the financier, who, it has been shown,

is the agent of the imperial council to receive moneys due upon the assessments. There was no privity existing between Thomas Henry or Mrs. Henry and these officers of the subordinate council with reference to his standing as a beneficiary member of the order, holding a relief certificate for her benefit, and their report to the imperial council is no evidence against Mrs. Henry, to whom the amount of the insurance was payable on the death of her husband.

Neither do this book or these reports have even the value of being writings cotemporaneous with the event, for it is not pretended that they were made at the date of payment or to be original entries of such payments, nor can they be considered as evidence against her as the record of the payment of assessments required by the law of the order to be kept. That law, heretofore quoted, required the financier to keep an account in which should be stated any payment of assessments made to him by the members, together with the date of payment. No such book has been presented, nor does it appear that any such book was kept by the financier.

Besides, the very appearance of these books and papers creates a degree of uncertainty and doubt of their correctness. The report referred to is dated on the 14th day of January, and purports to report suspensions and reinstatements on the 15th of January. Then there are erasures and alterations innumerable, and the cross-examination of Davis, the financier, with reference to the reports, developed many errors in the record which he says he really cannot make out, and cannot explain without going over the matter to read it up, and that he cannot give any better statement than he had, which certainly did not explain the discrepancy.

Being referred to the erasures on the return of February 24th, by which Mr. Henry's name was scratched off, and asked to explain why the back of the duplicate did not correspond with the original, says:

"The only explanation I can give for that is that it was neglect on my part in making the duplicate; there are a number of times I would make them out, and sometimes would forget to put the suspension or increase on the back of

my own; sometimes I would make them out and send them in, and they would be sent back to me again for correction."

He admits that, in his statement dated February 10th, he overlooked the fact that certain parties had paid; that after looking over his record, he found that they had paid the money before, and that he made the statement without looking at his notes. He says there is no book in which he kept a record of the payments made by Henry.

He is asked how he accounted for the fact that, on January 8th, he returned to the supreme council that Mr. Henry stood suspended on assessment No. 114, when, on December 30th, he had paid No. 114 together with 113 and others. He says No. 114 was due to be paid by the members, as near as he can make out from the book, on the 25th of December. And being pressed as to how he could report him, on the 8th of January, as suspended on an assessment which his receipt shows was paid on December 30th, says, as his explanation, that the money was paid to him after December 25th, and he made the statement there reinstating him, and, being further pressed, says, " I cannot explain that; I cannot say why I did not put it down."

He is next shown a book called a " roll-book," which he says he kept, which purports to be a record of the payments made by the members on their relief fund account, in which the name of " T. Henry " appears with assessments Nos. 116, 117, 118 and 119, with a cross marked over each, with the words " subject to examination," which words he says he wrote himself after Henry's death, possibly the first meeting night in March, and after a dispute had arisen as to whether he was suspended or not; and doubt is further thrown on his marks, from the fact that he does not give the same significance to the same marks, where they appear over the names of other members, that he gives to them when they appear over Mr. Henry's name. He says he reported Henry, on the 24th of February, as having been reinstated on February 11th, in order to help the widow, and he made that entry after his death and forwarded the $5.25 to Mr. Shedd, the imperial recorder, who declined to receive it

and returned it to him.   These instances are but samples of the untrustworthiness of these reports.

The defendants rely, in the next place, on the testimony of C. W. Davis to break the force of the evidence produced by the receipts and Mrs. Henry's testimony.   This testimony is very unsatisfactory, and his memory seems unreliable to a degree.

He says, on being sworn—"Exhibit C 5," which is a receipt signed by him, dated February 18th, 1890, for $4.20, purporting to be for assessments Nos. 116, 117, 118 and disability 1— that at that time Mrs. Henry paid him $5.25, and when asked why he gave a receipt for only $4.20, says that it was because he had paid assessment 115, amounting to $1.05, out of his own pocket, for Mr. Henry.   Thereupon, "Exhibit C 14" was shown to him, which is a receipt signed by Davis for $1.05, for assessment No. 115, which amount he admits Mr. Henry himself paid him.

Discovering the evident inconsistency of this testimony, he then says that the payment by Mrs. Henry paid not only the assessments named in that receipt, but an assessment ahead, namely, No. 119, which had been called, but which was not yet due.

Afterwards, he says that that payment paid *two* assessments in advance; that that was his recollection of it; to the best of his knowledge it would be assessment No. 119 and the second one ahead; that she paid up to date and two ahead, as near as he can remember.   Then, that there was an assessment called "disability assessment No. 1," and what he means is that she paid "disability No. 1" and No. 119 ; that was $5.25.

It is evident that the case must turn on the true history of the payment of $3, made by Mrs. Henry on the evening of January 15th ; for if that money is applied to the two assessments, 115 and 116, the first of which was past due and the other payable that night, then her payment of $5.25 on February 18th, by force of the laws of the society, reinstated her husband on all assessments past due and those payable at that date.

Mrs. Henry's statement of his payment is substantially that, on the meeting night.in the middle of January, which it appears

otherwise was the 15th of January, her husband had intended to go to the meeting, but could not, because he was sick at the time with grippe. She went to Mr. Davis' house about seven o'clock in the evening, and he not being at home, paid $3 to his son and told him to give it to his father, and that it was for two assessments. That would require only $2.10. She said that that was all the change she had, and that the son then spoke to his mother about the change, when Mrs. Henry said, "Never mind, my husband will see your husband in the morning, and he can give him the change," and that she left the $3. She said to Mr. Davis' son that "it was to pay two assessments that her husband owed, that just became due that night—one might have been past due and one due that meeting night." That, after her husband's death she spoke to Mr. Davis about the $3 which she had left there, and that he said he had never received it. She then said, "Oh, but, Mr. Davis, I gave it to your son; you must have received it;" and he said "You did not;" that he had never admitted receiving the $3 until he had admitted it as a witness on the stand, in the trial of the cause.

Davis says that he received from his son, sometime in the fore part or about the middle of January, $3, left at his house by Mrs. Henry, and that he applied that $3 to assessments. When first asked what assessments that was applied to, he says :

"As near as I can tell you, on the 30th of December, 1889, Brother Henry owed to me something in the neighborhood of $6.30. He paid me $2.10, I think, which was just before Christmas or New Year's, and I told him at that time that he must pay me more money; that I could not be keeping him in good standing all the time. He then sent his wife around to me, or around to my house, and she paid to my son $3, which was fifteen cents less than three assessments. That is as far as I can answer, and is as good an explanation as I can make of the matter."

He is asked :

"Then, as I understand it, you now claim that, on December 30th, when you gave Mr. Henry a receipt for five assessments, do you mean to say that you did not get $5.25 ?"

He says :

"I mean to say that I did not, but still I gave him a receipt for what he paid me previous to that. No—one moment—let me correct myself—this receipt was not made on December 30th. This receipt was made out and given to Mr. Henry after Mrs. Henry had given me the $3, or left the $3 at my house. Assessments Nos. 110 and 111 were the two assessments that Mr. Henry paid himself to me December 30th, and I told him that he must pay me more money; that I would not continue to send assessments away for him unless he did. Just about the middle of January, Mrs. Henry left $3 at my house, with my son, that I received. I *then* issued this receipt, dating it back to December 30th."

He says, further, that he did not receive any more money after Mrs. Henry gave him the $3, until she gave him the $5.25, shortly before Mr. Henry's death, but he cannot say when he received the money mentioned in the receipt dated January 15th, for $1.05, which is to pay for assessment No. 115. He says he does not believe he has any books to show the exact date when he received the $3, but that what he did with the $3 was to appropriate it to pay himself for what he had loaned to Mr. Henry to pay former assessments that he claimed were due from him, instead of applying it to the assessments, one coming due January 15th, or the other due before that night. He says, "I claimed the right to take out what I had advanced to Mr. Henry, or on his behalf, before applying any amount paid to me for anything further;" that it was his habit to report Henry suspended, and before the expiration of time that he could be reinstated, would pay the amount himself, so as to keep Henry in good standing in the council, if there was at the time another assessment about due, which he was bound either to report Henry as suspended on or to pay that one also; that he applied the $3 to the assessments that Henry had not paid, letting it run him as far ahead as it possibly would, and suspended him on the next.

Which of these two witnesses is to be believed? It is true, Mrs. Henry is deeply interested in the result of this suit; but while it may be of no pecuniary moment to Davis, it is important to him in his relations to the order. Mrs. Henry, on the stand, impressed me as a truthful witness. She told a straightforward story, with an air of sincerity and frankness, never

hesitating to testify to facts which bore against her, in striking contrast with Davis, who was uncertain, contradictory and ever ready with another story when confronted with evidence of his inaccuracy, to say the least. An examination of the testimony of Davis, attacking the correctness of his receipts, shows it to be exceedingly unsatisfactory, if not entirely unreliable. His first statement would indicate that the receipt of December 30th had been given upon that day, and that he had, at that time, been paid at least some money by Mr. Henry. The excuse he gives, that he had paid assessments out of his own pocket, in order to keep Mr. Henry from being suspended, does not explain his giving Mr. Henry the receipt he did. Henry never was reported as being suspended on Nos. 110, 111 or 112. He was reported as having been suspended on No. 113, the 10th of December, which must have been the date on which it fell due. He had until the 9th of January to reinstate himself upon that, and he had until the 24th of January to reinstate himself upon No. 114, which fell due December 25th, if he did not, in fact, pay them before either of those dates.

Why should Davis then give Henry a receipt for the payment of these assessments on December 30th?

He sees the inconsistency of this position, and then takes the ground that the receipt of December 30th was not given until after Mrs. Henry had paid him the $3 on January 15th. If this was the case, why should he date the receipt back? It could not affect Henry's position in the order, if it was true that he himself had advanced the money to pay the assessments for him.

Davis says that Henry paid him $2.10 only on December 30th, when he owed him $6.30 for assessments he says he had paid, leaving $4.20 due. The payment of the $3 would not have canceled that obligation.

Assessment No. 114 was the last one mentioned in the receipt, and the last due up to December 30th, when Davis says Henry paid him $2.10. Six dollars and thirty cents would be the amount of six assessments. If he paid them for Henry, he had paid from 109 to 114 inclusive. He says the $2.10 then paid

by Henry was for assessments 110 and 111. What became of 109? Why not, if he tells the truth, apply part to the oldest past-due assessment? Why let that stand and credit a later one?

According to this story, the payment of $2.10 on a debt of $6.30 left $4.20 due, and the credit of $3 would still leave $1.20 to clear up payments he claims to have made. Why should he then give a receipt, including 114, with $1.20 still unpaid?

The story all hangs on his claim of keeping Henry in good standing by paying when it was necessary to reinstate him and suspending him on the next assessment. As shown before, the $6.30 would run back to 109, and, if Davis tells the truth, we should find Henry suspended and reinstated on assessments 109 to 114 *seriatim* as they fell due, but the record shows he never was suspended on either 110, 111 or 112, and was not suspended on 114 in the report on that assessment, and not until a subsequent report.

Having sworn he received no money from the payment by Mrs. Henry of $3, on January 15th, to that made by her of $5.25, on February 18th, he is confronted with his receipt given to Henry for $1.05, under date of January 15th, for assessment 115. He admits the date is not to be relied on, but says that Henry himself paid him the money. It could not have been January 15th, for Henry was sick with the grippe that night; it could not have been before that, or it would not have been for 115 unless 114 had previously been paid. In this emergency he says that he gave Henry this receipt at the same time he gave him the one dated December 30th. This is the third statement he has made of that receipt—first, that it was given December 30th; next when he received the $3 Mrs. Henry paid, and this when Henry paid him $1.05, and he is at last positive that both receipts were given at the same time. This is entirely inexplicable. The date, January 15th, has no particular reference to assessment 115—it was due December 31st, could be paid on or before January 30th. Why should he draw two receipts at the same time, with different dates, when it could as well have

been included in one? It is probable the receipts themselves come nearer the truth than his evidence.

On re-examination he says, in seeming justification of himself, that after the $3 was paid he had a conversation with Henry and then gave him the receipt of December 30th for assessments 110 to 114 inclusive, with the evident intention of creating the impression that such appropriation had been made by Mr. Henry contrary to that of Mrs. Henry when she paid it. In his former testimony he had not said anything about this conversation, but claimed to have made the appropriation to his own debt of his own motion, because he had a right to do so. But in this last statement he does not say that Henry told him to apply it to what he owed him, but that he would do better in the future. A most significant fact in this connection is that Mrs. Henry says Davis always denied having received the $3 until the trial. It is true he denies it, but she cannot be mistaken, positively asserts it, and I believe she speaks the truth.

In deciding this question of credibility one cannot avoid the impression that if Davis' story is true, he was not only willing to, but actually attempted to, defraud the relief fund of his order, and to accomplish it made what he now claims was a false return.

The probabilities are all in favor of the truth of Mrs. Henry's statement. The circumstances were such as to make an impression on her mind. The payment of $3 by her was made on the night of the 15th of January—it was in the middle of winter, her husband was sick and could not attend the meeting. There must have been an urgent necessity requiring her to go to the officer of the council that particular night and make this payment. That necessity was two assessments which must be paid— 115 was past due and 116 was due that night. She acted as the agent of her husband and left the money with the representative of Davis, to be applied to two assessments which should be paid that night. There was certainly no call for her to leave the sick-bed of her husband to make the payments on that particular meeting night, in order to reimburse Mr. Davis an advance which he may have made to keep her husband in good

standing in the order.   Her memory of the details is clear and distinct, and she is not only uncontradicted, but borne out by the facts.   She went to pay two assessments, which amounted to $2.10.   She had $3, but did not have the exact change.   This led to talk between Davis' son and his mother, when Mrs. Henry said Davis could settle it with her husband when he saw him. If her errand had been to pay what Davis says her husband owed him, viz., $4.20, there could have been no conversation about change.

I am convinced that this payment was made by Mrs. Henry, on the night of January 15th, for assessments Nos. 115 and 116, and that such appropriation was not changed by Henry afterwards; and there is so much contradiction and uncertainty in the testimony of Davis that I am unwilling, in the light of Mrs. Henry's testimony, to give it credit to overcome the evident force to be given to the receipt dated December 30th, 1889.

The release which she signed was induced by the representations of the officers of the defendant council, that her husband was not in good standing in the order at the time of his death, and that she had no claim whatever for the amount of the certificate which she held.   An abandonment of a claim made under such circumstances, though with all the formality of a release, will not be permitted to stand in a court of equity.

The fact that she had the benefit of the advice of a distinguished counsel of this state, does not deprive her of this remedy, because he was likewise misinformed by these same parties with reference to her rights.

The use by Mrs. Henry of the $5.25 left on her table by Davis, falls within the same principle.   The defendant can be put in statu quo with reference to the $500 paid on the release and this $5.25 by the decree.

I am of opinion that the release should be set aside and that a decree should be made in favor of the complainant.